State of West Virginia at all versus the Department of the Treasury? Good morning, Counsel. Good morning, Your Honor. May it please the Court, Daniel Winnick for the Federal Government. I'll reserve three minutes for rebuttal. This is a very strange constitutional challenge to a Federal statute. The plaintiffs' states are asking the Court to adopt an onerous interpretation of the offset provision that's unsupported by its text and that the Treasury Department has But that would run counter to two basic limitations on the power of the Federal Courts. First, Federal Courts lack jurisdiction to entertain constitutional challenges to hypothetical statutes. And second, Federal Courts cannot hold a statute facially unconstitutional on the ground that certain hypothetical interpretations of the statute would be unconstitutional. As the agency recently recognized in affirming the dismissal of a similar challenge for lack of jurisdiction, the offset provision does not prevent states from cutting taxes either by its plain terms or as interpreted by the Treasury Department. Isn't the question whether the statute — are we talking about standing or are we talking about the merits here? I think both, Your Honor, but I'm happy to take the question on whatever terms Your Honor would like to ask. Let's start with standing. How about that? Sure. At least for standing purposes, as I understand the test from Susan B. Anthony on, it's that it needs to be — the statute — the conduct needs to be arguably prescribed by the statute. In other words, it doesn't have to be — we don't get to the merits. We don't get to whether you're right as to there. But if anyone can read it and someone can take a look at it and think that their conduct is prescribed by it, then that puts them within the realm of being injured or potentially injured by it. Is that correct? So a couple of points there, Your Honor. First, just — Am I right first? Am I understanding of the case law? I think you're right in describing the — just sort of by its terms, the Susan B. Anthony list standard for pre-enforcement challenges. I think that that is not, first of all, the theory on which the district court found jurisdiction here. But crucially, it is not blurring jurisdiction and the merits here to say that the statute simply doesn't mean what, you know, what plaintiffs say that they are afraid of. That is plaintiff's constitutional challenge. But again, that seems to be tangling the merits with the standing determination. I don't have to — let me put it this way. I don't have to decide at the standing stage what the statute means to be able to say that somebody looking at it could arguably prescribe their conduct as a result of that reading. And here, on the record, as I understand it, pre-filing the lawsuit, there is a letter from the attorney generals of 20 or so states which set out here are the things that we are considering. Here is how we read this thing. And we are really worried about having to accept this money because we don't think we're going to be able to act in accordance with that. How does that not come right within what we're talking about here? I mean, two points, Your Honor. First, that may have been true when they filed the lawsuit. Since filing the lawsuit, all of the plaintiffs — Standing though we look — do you agree with me? Standing we look at the time they filed the lawsuit? I agree with that. Okay. We'll get to the merits. Sure. There also has to be a concrete controversy today for jurisdictional purposes. True. They all have taxes. And just to the point about blurring standing the merits, take a look at this Court's decision in Club Madonna on which plaintiffs were like. Club Madonna is a constitutional vagueness challenge. The Court recognized in considering that it had to peek at the merits. It had to look at the statutory merits. We absolutely have to peek. That absolutely is the law. But we don't have to decide the merits. The Court certainly doesn't have to decide the merits. The merits here are the constitutional challenges. I do think that the merits, the constitutional challenges to the statute are not properly before the Court unless there is actually a statute that does what plaintiffs say. But I'm happy to move — Let me ask you a standing question. Is the standing inquiry different for the two claims that the plaintiffs are bringing? So on the one hand, they're saying this is a constitutionally ambiguous statute. On the other hand, they're saying this statute prescribes all sorts of tax cuts. Do we analyze standing differently for those two claims? Or would standing for one mean standing for the other? So, I mean, I think the standing inquiry certainly has commonalities as to the two claims. I do think there are arguably some differences. I mean, as to the — I mean, so for example, suppose that you thought this statute doesn't actually ban tax cuts, but it could be read to forbid tax cuts. I think then you could say, well, maybe there would be standing for the — Yeah, so let's — I mean, I think that's right. And so I see you — your standing argument sort of presupposes that we're going to say — or the government says that this statute doesn't ban all tax cuts. But does that really resolve the ambiguity? Because couldn't you still argue, well, we realize the government says this, but there's still a constitutionally ambiguous statute, and so couldn't there be standing for that even if there's not standing for the other? Susan, you are — I think the way I would put it is this. I think the problem we've articulated as jurisdictional with the ambiguity argument you can also think of as a merits problem with that argument, particularly the facial nature of it, which is if you sort of zoom out, what the district court said here is, I think this provision could be read to forbid tax cuts. Not that it is being read, not that that's the most straightforward reading of the text, not that it's consistent with the avoidance canon, but it could. And on the basis of that holding, that it could be read to forbid tax cuts, it held the provision facially unconstitutional and joined the enforcement of any interpretation. Well, let me put it this way. The could, though, gets us to standing. I think the could — I mean, we think standing is not present here because no one could. If I would agree that it could be read that way and other Federal courts have, who I consider reasonable, have read it that way, then we get to standing. You agree with me. If you made a conclusion, then yes. Okay. So then we get to the merits of what is the best or proper reading of the statute, right? Well, I would describe the merits inquiry differently. I mean, I think on ambiguity, the basic merits problem here is that no court has ever held a statute, a funding condition, facially unconstitutional on the ground that it was ambiguous. Yeah, I think that's a really good point. Unfortunately, in Binning v. Georgia, it seemed like we followed this exact sort of rationale where we said, look, that was about RLUIPA. And we said, look, the question here is whether this RLUIPA provision is facially unconstitutional because it's ambiguous. And then we did this analysis, and we said, well, it's not unconstitutionally ambiguous. But we still presuppose the idea that a statute could be facially unconstitutional because it was ambiguous. I mean, what do you say? I guess my question is, are you fighting that idea that we can do that analysis, or are you just saying this one is not so ambiguous that it's unconstitutional? So Benninger was not an action seeking an injunction against enforcement of the statute. That was a suit brought by a prisoner. The State of Georgia raised as a defense to that litigation that the statute violated the Pennhurst Clarity Requirement. That's the context in which the Clarity Requirement was brought. But what about NFIB? There is no ambiguity argument at issue. I know, but there was a spending clause challenge. Coercion. Affirmatively. Sure, you're right. Coercion. Why would it matter if one of the, what I'll call the dull factors, I'm sure other people call it something else, if one of the dull factors can be used in an affirmative way to get a declaration or an injunction, why would another one not be? It matters a lot, Your Honor, in the sense that if a condition is unconstitutionally coercive, then it actually can be facially unconstitutional. I mean, the ambiguity point is fundamentally different. I think that the Pennhurst Clarity Requirement is not a ground on which a statute can be held facially unconstitutional. It's a rule of statutory construction, which courts apply in resolving concrete disputes about the meaning of the statute. So here, if Treasury read the statute to mean what plaintiffs fear it could be read to mean, a State can raise as a defense to a recoupment proceeding. I just, I'm having trouble understanding why. You may be right on the merits, which is the point that I think Judge Brasher was raising, but I don't see why that dull factor can't be used as an affirmative basis to seek, even if you're right that at the end of the day, you win on the ambiguity issue, why it can't be used affirmatively. Let's get to the ambiguity issue. I have to say, I tend to think ambiguity is the wrong, I know we use it as shorthand, but it really isn't a matter of ambiguity, or at least that's a part of it. It seems to me it's really about ascertainability. In other words, is this an ascertainable condition that we understand going into it? In other words, do we know the agreement we're getting into? That's how it's used in contract law. Some of the cases I'll use it. I think it's a better shorthand than ambiguity, which is really sort of a subset of that. So let's focus on what I think are the two big ones here. The one is, what's the baseline for the net? And the other is, what does direct and indirect mean? Is that a fair description of really the two ascertainability issues? Okay, so let's get to the baseline one. Take the regulations out of it. How is someone to know what the starting point is for a net reduction in taxes? How could any state know that going into it? The statute doesn't answer how you calculate a reduction, but that is exactly the sort of detail about how you're going to apply a funding condition that is entirely left, that is permissibly left to agencies to resolve. The Supreme Court said in Bennett v. Kentucky Department of Education, a spending clause statute setting a funding condition doesn't have to resolve every detail of implementation any more than any other statute. So, counsel, assume with me for the moment that the regulations didn't exist or the department has just thrown up its hands and says, we're not going to bother. I know that hasn't happened, but assume it for the moment. You would agree with me in that world that at least that condition would not be ascertainable, correct? No. Then tell me how that is. The condition is that you can't use this federal fund money to offset a net reduction in revenue from tax cuts. That is the condition. The details of how that condition is going to be applied, such as how you go about determining whether a net reduction has occurred, don't have to be dealt with. Let's say for the moment that you and I, I am a landlord and you are a tenant, and you want to enter into a lease to rent a unit, and the unit is $700 for the year per month. That's clearly ascertainable, very easy. In the second year, you have an option, but the option says you and I are going to go out for a beer and figure it out for the second year. Is that an ascertainable condition that you know going in what the second year rent is going to be? It may not be in the context of a landlord-tenant contract, but the Supreme Court has been very clear that the contract analogy for spending clause conditions is only approximate.  there are roles for Congress and roles for agencies. All of that is different than the landlord-tenant context? I'm not saying it's the exact contract principles. Even though the Supreme Court has explicitly analogized the contract principles, I understand they don't directly align. But there has to be some ascertainable basis. Again, let's put the regulations aside. We're assuming my hypothetical. There has to be some ascertainable basis to say what the net reduction is. Is it from the beginning of time? Is it from the beginning of the pandemic? Is it from the year that they do so? How could the state possibly know, accepting the money, what the net reduction is, and if the Department of Treasury is going to bang them by seeking recruitment five years later because they don't know? As an issue matter, I have to say that the way Treasury has understood that is if you just have the statute, it's the most natural understanding of the statute. The statute enacted about the pandemic. The reduction is most naturally measured from the last pre-pandemic fiscal year, which is what Treasury said. But the most foundational point is the state does not, in order for this to be a constitutional funding condition, the state absolutely does not have to know from the statute itself that level of detail. It would be inconsistent with Benefer's concern. How is that level of detail? I mean, I understand that doesn't need to have metaphysical certainty. There's no doubt about that. But that doesn't seem like a trivial detail. Then that's it. That's the ballgame. What the net reduction is is what will lead to the recruitment. I don't think it's, I mean, Your Honor, it would be inconsistent with Benefer's and the Kentucky Department of Education and the Ralupa cases and lots and lots of cases granting deference to regulations interpreting funding conditions to say that that sort of thing has to be spelled out in the statute. And I would just note the broader point on ambiguity is even if you think the ambiguity issue is properly presented in this context, even if you think the statute on its own doesn't meet it, you can adopt a limiting instruction. You can say we're going to construe the statute to mean no more than Treasury has said it means. That solves the constitutional problem of plaintiffs who are identified. It's still not a basis to hold it facially unconstitutional. Judge Carnes, Judge Brasher, anything else? Well, I just, on that point, I just, could you just give me a little bit more about why this is distinguishable from Binning v. Georgia where we did this kind of analysis? I mean, we said in Binning that this is what we said about Ralupa. We said, It is sufficient for the text of Ralupa to link unambiguously its conditions to the receipt of federal funds. I think we've got that here. There's no question there's a link between the receipt of federal funds and this condition. And define those conditions clearly enough for the states to make an informed choice. So it seems like in Binning we said that there's a definitional requirement, an unambiguous requirement that applies to the informed choice issue, to how you interpret them. And it can't be solved by limiting and construction. I mean, what do you say about that? The distinction is that that was not a case in which anybody was seeking an injunction against the enforcement of the statute. Yeah, but I mean, but constitutional issues are often raised in response. I mean, it's the same issue, whether it's raised in response or whether it's raised, you know, as a plaintiff. I mean, I guess I don't know. Could you explain to me why that's a distinction that matters? Yeah. Respectfully, Your Honor, it's not the same issue. In a concrete context like that, the state is raising it as a defense. The question is, as a matter of statutory construction, did the state have notice of this or not? Did the state know that it, you know, couldn't do what it is accused of doing, what it's going to be made to pay money for or not? The question is analyzed all the time in that context. No court has ever said not just we're going to decide what the statute means in the course of deciding if the state had clear notice, but we're going to say you can never enforce this condition in any way because there could be some hypothetical uncertainty about how it's going to be applied. It's fundamentally different. Okay. Thank you, counsel. Thank you. Good morning. Good morning, and good day to the court. I'm Lindsay Seeley. I'm here today on behalf of 13 ad hoc states. Treasury on the merits talks around the central question before this court. They argue we're wrong that the tax mandate says we can't cut taxes because it only means we can't cut taxes with ARPA funds. But after sending a letter to Treasury asking for clarification, litigation around the country in six separate cases, and a rule from Treasury, we still don't know what it means to cut taxes with ARPA funds, given that money is fungible and the statute reaches both direct and indirect offsets. So I'm a little confused, and I always speak for myself because, you know, my colleagues are never confused, about how the regulations play into this. Because, to me, your best argument, I think, is the baseline argument. But the regulations seem to answer some of those. So how does that fall in, given that you sued pre-regulation, and where do we go from there? I know Judge Cole wrestles with this in the Ohio case. I'm wrestling with it as well. So maybe you can help me a little bit. Let me try. I think the first answer is I don't think that's legally relevant. And the second answer is the regulations make that issue worse. So it's not legally relevant because the Supreme Court and this Court has been clear in a spending clause challenge. It's Congress who must speak clearly. That's the language we have in the Benning decision. That's the language that we have in Pennhurst. Certainly, agencies can work out some of the details, but the rule of law for the states in order to determine what the bargain they're agreeing to has to be clear from the statute. Supplying that rule of decision is not something that the regulations can do after the fact. That has to exist in the law itself. Even where Congress explicitly says that we're leaving some of the details to the agency to fill in the blanks? Congress, of course, wouldn't say it that way, but Congress invited regulations in this case and explicitly authorized them? I want to be clear. I think there's certainly room for agency rules to fill in some of the details, but when it comes to what's the fundamental nature of the condition, what the states are agreeing to to accept the bargain, that actual decision has to be made by Congress. That's what we don't have here. We don't have any of that baseline there. We don't have any description of what the record directly means. Even if that's true, and I know this isn't necessarily the case in this lawsuit, but even if that's true, if the acceptance is after the regulations are on the books, in other words, at that point the state would know exactly what they were. Yes, they didn't come directly from Congress. Yes, Congress authorized the agency to fill in some blanks. Now the agency has filled in those blanks, and at that point we signed on the dotted line. At that point, is there not clarity, even if it doesn't stretch directly from Congress? I would agree that that would be a harder case, but I don't think we have clarity there because the regulations can always change. We don't have the same sort of certainty of the statute that you have. So is that the difference, is that this lawsuit was filed pre-regulations as opposed to post-regulations? Well, certainly this lawsuit was filed pre-regulations, so any argument that the regulations clears up the ambiguity there, that's not something that's going to salvage the position in this case. I think that would only be potentially in a future case could regulations solve that ambiguity. I don't think that's true in that future case. It's certainly not true here. And I think even if we look at these regulations, it doesn't actually solve the problem factually because the rule is very clear that even if in a particular year the state balances its budgets in a way that Treasury thinks is appropriate, years later Treasury can disagree. So in Bennett, the Supreme Court said that the Secretary's interpretation of the requirements of Title I, in that case Title I was at issue, should be informed by, quote, the statutory provisions, regulations, and other guidelines provided by the Department at that time. Now the at that time may be doing a lot of work there, but do you agree? That seems to suggest that the regulations do play some role, at least in the interpretive question of what the state agreed to or what those regulations are, could be the clear notice for those regulations for the statute. No, certainly I think the at that time is doing a lot of work, which makes that circumstance very different from this one. So I think the court could decide it on that. But we don't disagree. On the at that time, though, isn't that at the time the money is received as opposed to at the time the lawsuit is filed? Is that the at the time? Well, here we have the certification that the states entered into, and at least a number of the states entered that certification before the final rule came down. So we just don't have that timing consideration here. And again, we're not arguing that the regulations cannot clear up some of the details, but there's a big difference between filling in some of the gaps and supplementing the actual condition the states are agreeing to. Here we have a statutory provision that doesn't give any ascertainable standards for the states. It's not clear at all from the statute what the baseline is going to be, and it's not clear at all what it means to directly or indirectly offer. Yeah, I'm not sure about that, and this is why I think ascertainability is the better way to look at it rather than ambiguity. Indirectly is not an ambiguous word. I mean, it implies to any possible way that something can be done, whether it's a direct connection or any connection at all. So I think your reading is a perfectly reasonable one. Anything you can do that is going to decrease the taxes after this money is taken is going to be there. And they essentially say as much in the letter that's in response to you, and the regulations seem to cover most of that too. So I don't know that indirectly is ambiguous. That's where I'm having trouble with your position. It's not an ambiguous issue. It's a, do you really mean that you're stretching it as far as you say? Because if you do, then you run headlong into our right to the power to tax, right? Isn't that really what this is about? I think that's absolutely true, Your Honor. I think Treasury has resisted that interpretation and said that there is a plain text reading that doesn't go so far to say that indirectly covers anything. But I think the premise of your question is correct. There's nothing in the statute that gives that limit. So it is a fair reading of the statute, the one the states are saying here, that indirectly could mean we cannot engage in any tax cuts for a period of three or more years. And that does raise serious concerns in terms of Congress's limits on what states are able to do. That gives you our sovereign interest state. Actually, that's not what they said. They said you couldn't fund tax cuts for three years using these funds. Yes, Your Honor, but I think that's the question we have about how far does indirectly go. I understand that, but they did not say you can't have any tax cuts for three years. That is true. You've got a strong case, but you need to stick to the facts of the case. Your Honor, I apologize. I'm not trying to overstate the argument. I agree that's not what the statute says. But when the statute says you cannot indirectly offset any reductions in revenue using these funds. That's a different point, counsel. But let me ask you this. The 21-AG letter that went out on March 16 and the DOJ didn't answer it and said don't worry, they'll all be clarified basically in the regulation. Did any of those 21-AG's, your group or some combination less than your group, put those questions to the Treasury Department during the consideration of what regulation they were going to issue? Yes, a subset of the states, I don't have the exact number, did file comments on the interim rule that raised many of these same concerns. All right, but how many of the 17 comments, 17 questions? Your Honor, I'm sorry, I don't have those comments in front of me, so I don't know how many in particular from the first letter the 21 states filed to the comments on the rule. But there were a number of states from the same coalitions who did file in the rulemaking process and raised all of the same concerns that we're raising here, that this is a funding issue. I'm not talking about concerns. I'm talking about your bullet points, about hypotheticals and specific questions you have. Not just we're concerned about this because we don't know what it means. I thought your letter with the 17 questions and bullet points were specifics. If we do this, we're considering this legislation and doing that will thus violate the statutory command or condition and so forth. Did you put that to the Treasury Department? Your Honor, and I apologize, I do not have those comments in front of me, so I cannot answer that question. What I can tell you is that those comments raised the same concerns that we do not know how to interpret directly or indirectly offset, but I don't know if those 17 bullet points appeared in the comments as well as in the letter to Treasury originally. But if you wanted to know, wouldn't a reasonable thing have been to ask Treasury to clarify that in the regulation? Here's what we're concerned about in the statute. We may not think it's fixable, but if it is fixable, here's the 17 questions you need to answer in the course of fixing. Why not do that? Well, Your Honor, that certainly would have been an option, and again, I wish I could say for sure whether... I know it's an option. I wouldn't have asked if it hadn't been that option, and I'm asking you why the states did not do that. Your Honor, and I'm not trying to fight that premise. I think that it is, of course, an option, but it's not legally required, especially because we already asked Treasury that those very specific questions... I'm not asking you whether it's legally required. That's the next step. I'm asking you why you didn't do it, why the states didn't do it. If what they're concerned about is ascertainability, why not try to get some ascertainability from the regulation during the regulatory process by asking the Treasury Department? Your Honor, and again, I have to apologize. I'm at a disadvantage because I do not know if, in fact, we raised all of those same bullet points in the comments, because I do not have it here, and it's not in the record. What I can tell you is that we asked those specific questions to Treasury once, and Treasury told us it would not give us specifics. I can also tell you that it is not required for us to seek clarity through the rule, because we're constitutionally entitled to clarity through the statute, and we do not have that here. I don't know. You're fighting my question by saying you're not required to do it. We may decide that that factors into the decision. We may not. I'm simply trying to obtain a historical fact of why you didn't do it from the counsel for these states, and what I understand you to be saying is you don't know. Correct. I'm not trying to fight the question. I do not know if that is in the comments before Treasury. Can I ask you to comment on the exchange I had with the opposing counsel about the sort of, is this a claim that states can make? Can they bring a facial challenge to a spending statute and say, this is ambiguous, and so we just don't have to comply with it? It's facially unconstitutional. What do you say about the government's argument that that's just not a claim you can make? I think what the government is doing is pointing to particular procedural postures of the case before this Supreme Court, but it hasn't given a reason why that's not an appropriate claim, and I think we've seen that analysis in other cases. Judge Brasher, you mentioned this Court's decision in Benny, which proceeded under the same analysis. I think the Supreme Court's Pennhurst analysis also proceeded along similar lines. It looked at a bill of rights. But I think in Pennhurst, though, it seemed as the Supreme Court was saying that it was unclear whether this was a spending condition at all, right? That was the analysis in Pennhurst. I am unaware of, and point me to one if there is one, I am unaware of a decision by a court outside of this context that says this spending provision is unconstitutional because it's ambiguous, and therefore we're striking it facially from the statute. Is there any court that said that? No, we don't have an example of a court who has done that in that posture. We do have examples of courts who have used that analysis. I think this idea of all that Congress has to do is show a condition exists and not that states can understand or ascertain it, that's not something that any courts support, certainly in Benny, and that's not what this court was looking at there. It was concerned about the content of the provision. I think we see that in the Supreme Court's Arlington decision as well. In that case, we were dealing with the interpretation of reasonable costs and whether expert fees factored into that reasonable assumption instead of attorneys' fees. Counsel, if we reject the ambiguity argument but think that there may be some other arguments that you might be successful on, would you be asking us if we reversed on that portion to remand for the district court in the first instance to then rule on the 10th Amendment issues, the power to tax issues, some of the other issues that you raised that the district court did not reach? No, Your Honor. I think there's no need to do that. We cite the cases from the circuit in our brief that says the court can affirm on any ground, even one that the district court did not find a need to reach. And there's good reason to do that here because these are all purely legal questions. There's no more facts that would be developed necessary to resolve the coercion claim or the anti-commandeering claim. So if this court were to reject the First Vending Clause challenge, it could certainly proceed to coercion and reach the same result that the Northern District of Texas did or that the Kentucky decision out of the Sixth Circuit did as well. And I think if we do want to look at coercion, there's three factors that bring this case within the Supreme Court's coercion analysis. First, we're dealing with an extraordinary high dollar amount, both in absolute and relative terms, compared to state budgets. The context in which it was offered... Counsel, I have to say, for me, you have a higher mountain to climb on coercion than you do for the ascertainability standard. But it seems to me a critical difference here is that this is not money that... This is new money. In other words, you know up front what you're getting or not getting, as opposed to the situation where the Supreme Court has seemed to weigh in, which is where you've already taken the money and then we sort of dangle something else on this money that you've already gotten used to in terms of the coercion standard. How does that difference play in? Of course. Certainly, Your Honor, we're very happy for the Court to affirm on the ascertainability grounds. I don't think the new money, existing money distinction does all of the work Treasury says it does. If you look at the NFIB decision, the Court was certainly talking about unsettling state expectations from existing funds, but it talked about a different kind of problem when it comes to the amount of money at stake, enough that takes encouragement to adopt Congress's priorities into the level of pressure and outright coercion. And that's what we're dealing with here. But how can... I mean, I guess I share Judge Luck's skepticism about this. It seems very odd to me as just a practical matter that the more money Congress gives to the states, the fewer conditions Congress can put on that money, right? You would think that if they're giving a whole lot of money to the states, that their spending clause power would give them even more ability to add conditions to it and not less. I mean, what... Explain what I'm missing about that. I certainly don't think the amount of money is doing all the work. I think another factor that the Court looked at, and FIB is at work here, it's not just conditions on the money that Congress is giving, it's conditions on the states' money and what they're able to do in terms of state taxing policies. That's another distinction that the Court drew in NFIB that simply... that was not the case there, that was only restrictions on how that money was used. But here Congress is going further and is saying, we want to dictate states' own policy and ask them to give up an entire sovereign power of whether they can reduce taxes or not. That takes us outside of NFIB. And how... but how... I guess, just to push back on that a little bit, and I don't know that it's worth spending a lot of time on this, but just... Congress often tells states, look, if you want our money, you're going to have to spend money of your own, right? So highway funding works that way, Medicaid works that way, basically everything works that way. All the maintenance of care cases. Yeah, how is this different? This is Congress saying, if you want this money, you're going to have to keep spending the same money that you spent before. You can't reduce your overall tax. It just seems like this is just a different sort of species of the same thing Congress always does. Well, it's different because Congress didn't actually say that in the statute. I think if we look at the Supreme Court Bennett case, that's a very good example. Treasury, in their brief, says it stands for the broad principle that federal funds are supposed to supplement and not supplant federal funding. But if you look at the actual language of the statute that Bennett quotes, it says, quote, in no case will this particular money be used to supplant funds from non-federal sources. That goes to the clarity issue, though, but not to the coercion issue that Judge Brasher is talking about here. In just piggybacking off the question, the distinction is that this is regulated a tax. I just don't see why the state's sovereign interest in its own budget is not as equal as its taxing power is for purposes of the coercion element. I'm just, I'm having trouble making that distinction. Well, I think one of the reasons that the coercion is particularly troubling here is because, and I will say that I think the ascertainability argument feeds into coercion because it's not clear how far this restriction on indirect offsets goes. So there is a fair argument that it means that states really don't have any safe option other than not cutting taxes for a period of three or more years. So it's not just asking states to use their state power in certain ways for certain federally preferred programs. It's really saying you cannot use your power to cut taxes at all. Judge Collins? Yeah, I suppose, let's take that hypothetically you just helpfully posed for us. Suppose Congress had said, look, we don't want to get into this ascertainability ambiguity thing. We know about the fungibility of money. We've all had two econ courses, et cetera. We're going to avoid all that. We're looking for stability and clarity. So what we're willing to do is to give you a lot of money over the next three years, but only on the condition that you not change one letter in any of your tax statutes or regulations and that you not reduce your tax enforcement employee staff levels by one person. Now, there's no ascertainability problems there. Right. Those are ascertainable facts. Agreed. Is that unconstitutional? It would still be unconstitutional based on the coercion concern and also anti-commandeering concerns. So you can't let the state decide between a whole lot of federal money and giving up something the states could otherwise do. Because in that context, the whole lot of federal money is doing a lot of work and also the context in which the federal government... No, no, I'm asking you yes or no. It's not a explain us why you like your answer. Give me a yes or no. Congress can't say, we'll give each state $40 billion. If they won't change any provision of their tax laws or regulations or staffing manpower. No, Congress cannot do that. Okay, so Congress can't leave it to the states to make a decision about what's in their personal interest or what's in their individual interest in that respect. No. The federal government's here to help us. They get to decide that we don't get any money. As opposed to letting us decide whether we get some with that condition. No, your honor. And if I could explain why, it's because in that case, states do and should have a voluntary choice whether to accept federal funding. Of course, states have that ability. But in a context like this, where there's so much money at stake and in the context of a once in a lifetime pandemic, it's not realistic for any of the states to say no to that offer. So if it was $10 million per state, you'd have no problem with that coercion-wise? I'm sure we would not be arguing here for $10 million. But when we're arguing here for... How about $100 million? Where is the line? Your honor, there's not going to be a bright line here. Coercion has to look at the facts in the same way we look at... What about if you go to someone who's indicted for murder? It's a real case. And you say, look, if you'll just plead guilty, we won't give you the death penalty. But if you don't, we're going to get it for you. Is that coercion? You waive a constitutional right, it's not the 10th Amendment, 6th Amendment, 5th Amendment, but we'll give you a benefit if you waive it. Is that coercion? Your honor, I'm not familiar with that particular case and how the court came out, but I think the analysis... No, I'm asking you. Forget the court. You're the court. Is that coercion? Is that choice involuntary because the guy's got to take it to avoid dire consequences, just like the state's got to take this money to avoid dire consequences? I think as long as that choice is fully informed and knowing, I think very often the choice to accept a plea deal is not going to be held to be involuntary in that context. All right. It wasn't in U.S. v. Brady, but in U.S. v. Jackson, the Supreme Court said you can't have a statute that says only the jury can impose the death penalty because it coerces defendants into waiving the right to a jury and going to a bench trial. So the Supreme Court has not been of one mind, at least not of one coherent mind. And it's the question of when a concession amounts to a capitulation, when a choice or condition becomes coercive, even though it conveys a new benefit, has been vexing for... since early time. Thank you, counsel. And I don't believe anybody has answered that question, and I'm not sure that any of the press and senior science answers the question. Thank you, counsel. That's not a question. It's a good comment. Thank you. Counsel, we went a little bit over, so I'm going to give you some extra time as well, five minutes for rebuttal. Thank you. I really appreciate it. Thank you. And just a few points. First, the regulations certainly undermine any concrete controversy that might have existed when this suit was brought. This is a point the Sixth Circuit raised recently in a supplemental briefing order in the Kentucky case. Even if anybody at the time of the suit could have been uncertain as to how this condition would be applied by the Treasury Department, even if that would be a basis for an injunction on ascertainability grounds, that is just no longer true. The states are refusing to take yes for an answer on this. Second... So your point is the regulations solve the issue? I think they certainly undermine the existence of any concrete controversy. What about... But address the point your co-counsel raised. It does seem to be that the case law refers to Congress in making the deal, and it does seem to be that, especially given some of the seesaw we see in regulations between administrations, that regulations really can't fit the bill because of how ephemeral they are and also because that's not really the agreement. Let me ask it even a little bit more clear. Imagine if the states, the second a statute passed, sent in the form and said, sign us up, we want our millions right now, without knowing or having anything to do with the regulations. We wouldn't have a regulatory case. We'd only have a statutory case, right? Well, Your Honor, I think there still would be, in order for this court to resolve the case, there still would have to be a concrete controversy existing on the day this court decides it. My point is that whether or not at the time the suit was brought, they might have had some doubt as to how Treasury was going to decide this, whether Treasury was going to think this is a no-tax-cut condition. That doubt just no longer exists. On the merits of the coercion and anti-commandeering issues that my friend raised, we're happy, I think, to rest on our briefs on this point. I'm happy to take any questions the Court may have. We don't object to the Court's resolving those issues if it reverses on ambiguity. On the third point, on the nature of the ambiguity issue and whether it could be a basis for a facial injunction, I would just point the Court to the opinions of the unbanked Sixth Circuit and the School District of the City of Pontiac case that's at 584 F. 3rd 253. The opinions in that case, there was no opinion of the Court, but there were several different opinions, all of which treated the Pennhurst's clarity requirement quite clearly as a rule of statutory construction, including an opinion from Judge Sutton that explains why, even if it is constitutionally grounded, it is ultimately a rule of statutory construction to be applied in resolving concrete disputes about the meaning of a funding condition. I thought Judge Cole clarified all of that, including on a case where he apparently sat on a Sixth Circuit panel about whether it could or couldn't be and how it all interplays together. Am I wrong on that? Your Honor, I don't recall, and I also don't recall whether in that case it was, if it was that case, I think it was Judge Cole of the Sixth Circuit and not Judge Cole of the Southern District of Ohio, but I don't remember the detail. I'm sorry. And fourth, the foundational point here, it just is not a fair reading of this statute to say that it means you can't cut taxes. It is, by its terms, a restriction on the use of funds to offset a reduction in net tax revenue. Every state that has a balanced budget requirement, including all 13 of the plaintiffs, is quite familiar with the fact that when they cut taxes, they have to figure out if that's going to reduce their net tax revenue. If it does, they're going to have to figure out if they're going to raise their revenue or if they're going to cut their state spending so that their state spending and state revenue are again in parity. The only thing this provision does is it says that when a state does that, it cannot use these new federal funds to make its budget numbers add up. If it's going to cut taxes, it has to have enough state revenue to do that, which states generally do because they've seen significant revenue growth, which is why all of the plaintiffs have cut taxes, or it has to cut its own state spending outside the areas where it's spending these federal funds in order to make the numbers add up. That is a basic requirement. How do you address the fungibility of money, though, when you're making that interpretation of the statute? Because the state isn't... During the state's budgeting process, the state isn't looking at things that have... It doesn't know how much money it's going to get, right? So these are all predictions and estimates and whatnot. So when a state decides it's going to cut taxes, you're right, there is an analysis that goes on during the budgeting process that says this is how much we expect to get. But a state can always, at the end of the day, say, look, we didn't get this money that we thought we were going to get. We're going to spend it some other way. I guess it just seems like the fungibility of money is a serious problem with your limited reading of the statute. I don't think so. I mean, I think our whole reading of it is built on a frame that recognizes the fungibility of money. The point is, you look at, has your revenue actually decreased? It hasn't decreased. There's no reduction in revenue. There's nothing to offset. Yeah, but that's looking at it backwards, though, right? That's my point. Like, you're looking at it backwards. You can't... That's not the way you look at it when you're setting the budget. That's the way you look at it if you're looking at last year's budget. When you're setting this year's budget, you don't know what the revenue is going to be. That's true. It's the final number. The regulations do recognize that when you're trying to figure out if a change in your tax laws is going to reduce revenue, you can rely on a reduction. But the basic point is the fungibility. I mean, that is why, for example, we recognize that if you cut spending outside an area where you're spending fiscal recovery funds, that is a permissible way of offsetting a tax cut, even if it has caused a reduction in revenue. So, you know, again, the mechanics of the budget are difficult, but nobody's requiring a state to draw a precise connection between a dollar it receives in federal funds and where it is being used. The whole point is, considering state's own budgeting processes, does a state have enough of its own money to pay for the tax cut? Has it seen revenue increases because of that? What if it doesn't? I mean, so what if as part of the budgeting process the state says, yeah, you know, we're going to cut gasoline taxes because gas prices are so high, but we anticipate that that's going to be made up because, for some other reason, and so we're not going to use this recovery money to offset, right? But that's not what happens. You know, if at the end of the day the state has a reduction in its tax revenue, and it doesn't have enough of its, because of a tax cut, and it doesn't have enough of its own money to, you know, pay for that reduction, then it has violated this condition. It has used these federal funds to pay for the tax cut. It couldn't otherwise have afforded it, and that is what Congress forbade, and it is within Congress's core power under the Spending Clause to set conditions for the use of the federal funds that it appropriates. So the state will just have to under-budget. They'll have to make sure they have a revenue surplus in case there's a dip in the economy, a dip in sales tax revenue, a dip in gasoline tax revenue, in the unlikely event that the price of gas goes down. All right. Actually, there would be a dip if the price of gasoline goes up and people drive less. You can't anticipate those things. So one of the ways the state can be sure they don't have money subject to recruitment by the federal government is to under-spend. Right? You can't spend any of these funds unless you under-spend everything else because if there's an unanticipated dip, a drop, a dip or a drop, in the tax-generated revenue, you're going to be in trouble. Well, I mean, let me, I'm far from an expert in budget mechanics, Your Honor, but let me try to answer it. I mean, the states have all seen significant revenue growth from before the pandemic. If their revenue is, you know, $3 billion higher than it was and they're cutting taxes by, you know, $100 million, there's a lot of buffer space there. This is not an unforgiving requirement. This is simply a requirement that they, at the end of the day, have enough state money, not to sort of pay for everything they would spend, but to pay for the tax cuts they've undertaken. If they don't have that, then they have used these federal funds to offset tax cuts, and that violates, again, Congress's basic power to set conditions. Right. So, I mean, you're saying this is, I mean, I think all this goes to your overall point, which is this sort of is a hypothetical question for us because as a matter of fact, we all know the states have got a lot of money. Tax revenue has gone up since 2020. There's lots more economic activity. Things are fine in state budgets. So this is, this is sort of along your line that this is kind of a hypothetical question. It's not a real, like, present controversy. Is that right? Certainly, Mayor Conner, and the ascertainability issue, to the extent there is one here, is properly resolved in the context of any concrete controversy that may arise, which has not arisen, certainly, with any of these states. Treasury has not brought any recoupment proceeding against any state under the offset provision. So this is all a hypothetical issue and not a proper basis for this Court to decide the question, much less to affirm an injunction against the facial enforcement of this spending condition. Thank you, Counsel. Thank you. We'll call our next case.